## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Brenda Gudgel, Individually and All
Others Similarly Situated,

  Plaintiff,

  vs.

TARGET    CORPORATION   and
TARGET BRANDS, Inc., Inclusive,

  Defendant.

_____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Brenda Gudgel ("Plaintiff"), by and through her attorneys, brings this action individually and on behalf all others similarly situated against TARGET CORPORATION and TARGET BRANDS, Inc., Inclusive ("Defendant" or "TARGET CORPORATION" as referred to hereafter). Plaintiff hereby alleges, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), as the amount in controversy exceeds $5

million, exclusive of interests and costs; it is a class action of over 100 members; and the Plaintiff is a citizen of a state different from at least one Defendant.

2. This Court has personal jurisdiction over Defendant. Defendant has sufficient minimum contacts with the state of Florida and purposefully availed themselves, and continue to avail themselves, to the jurisdiction of Florida through the privilege of conducting its business ventures in the state of Florida, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

3. Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, as Defendants do business throughout this district, and Plaintiff made their purchase of TARGET CORPORATION's Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") in Brevard County, Florida from a retailer in this district and the purchased Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") was delivered to, and used, in this district.

## THE PARTIES

4. Plaintiff Brenda Gudgel is a natural person and a citizen of Brevard County, Florida, residing in Brevard County, Florida. Plaintiff purchased Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") from a local Target

Store. She purchased the Product for her own personal use during the applicable statute of limitations in Brevard County, Florida.  Plaintiff, Brenda Gudgel's most recent purchase was Defendant's Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products"), which was purchased at a Target Store for approximately $4.99 during the applicable time perios.  Prior to purchasing the Products, Plaintiff saw and read the packaging which is sold under the label "Up & Up" as a product of Target.  Plaintiff reasonably believed that the product she was buying was safe to use and had been properly tested.  The Plaintiff was not aware that the product contained PFAS chemicals, a synthetic chemical that can be harmful to her health.  Had Plaintiff known that the Products were harmful or not properly tested, she would not have purchased the Products.

5. PFAS is not listed on the packaging for the Product.

6. Plaintiff trusted the Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") to be safe for use, as it is a generic product offered by a large retailer (Target) for utilization by a large number of consumers of all ages.

7. Plaintiff did not expect a product, particularly one branded "Up & Up," would include harmful products.

8. Plaintiff would not have purchased the Product if she knew that the product contained PFAS Chemicals, which could be harmful to her health.  No consumer warning to this effect was placed on the packaging.

9. Plaintiff would purchase the Product in the future; however, Plaintiff cannot now or in the future rely on the representations on the Product's labels because she cannot know whether the safety claims remain false, and she may reasonably, but incorrectly, assume the Products were improved.

10. Defendant TARGET CORPORATION is a citizen of Minnesota company with its principal place of business in Minneapolis, Minnesota, which is in Hennepin County, Minnesota.

11. Target sells healthcare products under the brand name Up & Up. One such line of products is the Up & Up adhesive bandages.  At all relevant times, Target conducted business and derived substantial revenue from its manufacturing, advertising, marketing, distributing, and selling of the Products within the State of Florida.

12. Defendant and its agents promoted, marketed, and sold the Products in Florida and in this District. The unfair, unlawful, deceptive, and misleading advertising and labeling of the Products were prepared and/or approved by Defendant and its agents and were disseminated by Defendant and its agents through

4

labeling and advertising containing the misrepresentations alleged and disseminated uniformly through advertising, packaging, containers, and via websites and social media.

## FACTUAL ALLEGATIONS

### I. The Products and Defendants' Marketing

13. Defendants market and sell flexible fabric bandages of various sizes under the brand name Up & Up in Target stores and online.

14. The Products claim to provide "stretchable, breathable protection" that are adhesive to human skin. Each bandage has adhesive flaps with an absorbent pad in the center that serves as a cushion for cuts, scrapes, and other injuries to the skin.

15. According to the packaging, the Products are "sterile" and "not made with natural rubber latex."



16. However, Defendants' packaging of the Products does not disclose the presence of PFAS chemicals.

17. Reasonable consumers purchased and continue to purchase Defendants' Products under the reasonable belief that they do not contain synthetic chemicals that could adversely impact their health or the health of their children.

## II. PFAS in Defendants' Products.

18. Defendants' Products pose a health and safety risk due to the presence of PFAS in the Products.

19. Mamavation is a consumer "watchdog" community group, which provides "ecowellness product investigations for moms."

20. To enable consumers to avoid the harms associated with PFAS chemicals, Mamavation has commissioned consumer studies on numerous beauty and personal care products, foods and beverages, supplements, menstrual products, clothing, food packaging and parchment paper, baby and children products, electronic equipment, and cleaning and laundry products.

21. Because of known toxicity associated with PFAS, Mamavation commissioned scientific studies on indications of PFAS in bandages, to analyze popular bandages marketed to consumers.

22. To conduct the studies, bandages were purchased and donated from Mamavation community members between November 2022 and February 2024 from Walmart, CVS, Rite Aid, Target, and Amazon. Each of the products tested was recorded in Mamavation's database and then sent directly to the lab within the product's original packaging.

23. Mamavation sent 40 bandages from 18 brands for testing at an EPA-certified laboratory, including Up & Up Flexible Fabric Bandages.

24. Mamavation's EPA-certified laboratory uses marker testing to identify the potential presence of PFAS chemicals in bandages. Organic fluorine is a marker for PFAS because all PFAS are carbon-based compounds that contain fluorine. The

specific laboratory method used to test for total fluorine was the Determination of Total Fluorine by Oxygen Flask Combustion and IonSelective Electrode. If total fluorine was observed at a detection level of 10 ppm or greater, the laboratory did the Determination of free Fluoride Ion in the product by Ion-Selective Electrode and then subtracted that from the Total Fluorine to determine the amount of organic fluorine. This marker testing is likely to show the presence of PFAS. Organic fluorine can also capture other fluoropolymers, pharmaceuticals, and common hydrofluorocarbon refrigerants, such as 1,1,1,2- tetrafluoroethane (commonly known as R-134a) and 2,3,3,3-tetrafluoropropene (commonly known as HFO-1234yf), which are all also PFAS chemicals.

25. Total organic fluorine analysis is used to detect organic fluorine, which is the foundational element (and defining characteristic) of PFAS chemicals.

26. In the context of chemistry, the term "organic" refers to compounds containing carbon. Organic fluorine is created by the chemical bond between carbon atoms and fluorine atoms. The strong bond created between carbon and fluorine is what defines PFAS chemicals and is the reason for their common usage.

27. Total organic fluorine testing is critical to the detection of the 99.99% of PFAS that cannot be detected through limited targeted testing. Because organic fluorine is the identifying element of PFAS chemicals and is present in all PFAS varieties, the detection of organic fluorine in a sample necessarily means that PFAS chemicals are present in some form.

28. It is nearly impossible for total organic fluorine testing to yield a false positive detection of PFAS in a sample. Total organic fluorine testing only measure fluorine that originates from a substance where fluorine is attached to a carbon backbone. Therefore, total organic fluorine testing does not detect any other forms of fluorine, such as inorganic fluorine (i.e., fluoride).

29. Organic fluorine is not naturally present in the human body, and is practically nonexistent outside of its use in man-made PFAS chemicals.

30. In light of the limitations of targeted testing, total organic fluorine testing is the only method that is able to reliably detect the presence or absence of the thousands of varieties of PFAS chemicals for which targeted testing is not currently available.

31. Consequently, total organic fluorine testing is widely accepted by scientists, researchers, and regulators as the reliable method to detect a PFAS chemical in a sample.

32. According to Scott Belcher, Ph.D. & Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University, "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be contributing to the organic fluorine found in bandages. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE. However, the analysis of total organic fluorine (TOF) does account for all PFAS contaminants in bandages, including PTFE. Therefore, this method of testing serves as a good 'spot-check' of consumer products."

33. Testing of Defendants' Bandages found 256 parts per million (ppm) organic fluorine on the absorbent pad and 253 ppm on the sticky flaps.

34. In response to the results of the studies, Linda Birnbaum, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences and National Toxicology Program & Scholar in Residence at Duke University stated: "Because bandages are placed upon open wounds, it's troubling to learn that they may also be exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care, so it's important that the industry remove their presence to protect the public from PFAS and opt instead for PFAS-free materials."

### III. PFAS Chemicals Are Harmful to Humans

35. According to the Agency for Toxic Substances and Disease Registry, PFAS chemicals "are man-made chemicals that have been used in industry and consumer products worldwide since the 1940s. They have been used to make nonstick cookware, water-repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."

36. One common characteristic of concern in regard to PFAS is that many types break down very slowly and can build up in people, animals, and the environment over time. In fact, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and our bodies.

37. Consequently, PFAS chemicals are often referred to as "forever chemicals."

38. PFAS are often divided into two groups: long chain and short chain, both of which break down slowly, if at all. In fact, long chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks. Regardless of length, research from the U.S. National Toxicology Program suggests that both long chain and short chain PFAS have similar levels of toxicity.

39. PFAS chemicals have been connected with severe and lingering health consequences. Erika Schreder, Director of Science at Toxic-Free Future, and Jennifer Dickman, Senior Program Associate of Safer Chemicals, Healthy Families, have explained that "[p]rimary among [PFAS-linked health concerns] are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."

40. Similarly, Dr. Lina S. Birnbaum, stated that "[t]hese toxic chemicals are linked to serious problems like cancer, liver damage, decreased fertility, and asthma. … PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."

41. In children, PFAS has also been linked to "[l]ower antibody response[s] to some vaccines," thereby rendering children more vulnerable to diseases they would otherwise be immune from.

42. Significantly, a study conducted by the National Institute for Occupational Safety and Health found that "dermal exposure to PFOA is immunotoxic and raise concern about potential adverse effects from dermal exposure."

43. PFAS chemicals can be harmful at extremely low levels of exposure. According to the EPA, the levels at which negative human health effects could occur are significantly lower than previously understood, including at near zero in some instances.

44. In other words, there is no "safe" level of exposure to PFAS chemicals. Even "trace" levels of PFAS can be harmful to human health.

45. There is no effective treatment for removal of PFAS chemicals from the body. Therefore, experts agree that the most effective strategy to decrease health risk is to avoid and/or limit exposure to products known to contain PFAS chemicals.

46. Only in recent years has the presence of PFAS used in consumer products, and their consequent risks, begun to be publicized and discussed in the media and scientific literature. Based on this newly available information, consumers are rightfully concerned about the presence or risk of PFAS in various consumer products.

47. In June 2022, the EPA announced a lifetime health advisory related to PFAS. A health advisory is not a binding regulation but serves as "informal technical guidance to assist government officials." The June 2022 advisory sets lifetime health advisory levels for PFOA at 0.004 parts per trillion (ppt) and PFOS at 0.02 ppt. These levels are below the detection capability of most measurement devices, meaning that EPA considers any detection of PFOA or PFOS to exceed the lifetime health advisory level.

48. On April 10, 2024, the Biden Administration issued the first-ever national, legally enforceable drinking water standard to protect communities from exposure to PFAS. The standards set a maximum contaminant level of 4 parts per trillion for PFOA and PFOS individually. For other forms of PFAS, the maximum set by the Administration is 10 parts per trillion.

49. Moreover, for PFOA and PFOS, the EPA is setting a Maximum Contaminant Level health-based goal at zero. This is reflective of the latest science supporting that there is no level of exposure to PFAS without risk of health impacts, including several cancers.

50. For context, 10 parts per trillion equates to .0001 parts per million. This means that the PFAS found in Defendants' Bandages of up to 256 parts per million goes well beyond the limitations set forth by the government on drinking water.

**IV. Defendants' Misrepresentations And Omissions Are Actionable**

51. Plaintiff and Class Members would not have purchased the Products on the same terms had they known the truth about the Product.

52. Nowhere on the Products packaging or labels do Defendants disclose the presence of PFAS. Reasonable consumers would believe the Products to be free of harmful toxins.

53. Moreover, on Target's website page to purchase the Products, Defendants state, "we believe making smart choices for the people, places, and pets in your life should be easy and affordable. And having quality you can trust should be a given. That's why you can count on our promise – caring for your everyday in every way."

54. Plaintiff and Class Members bargained for bandages that were free of harmful toxins and were deprived of the basis of their bargain when Defendants sold them a Product containing PFAS.

55. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

11

56.  Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendants were under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products may contain substances known to have adverse health effects. Defendants, as manufacturers or parties to a contract to manufacture, thereby providing and approving designs of the Products, and as sellers and advertisers of the Products, are best situated to know the content of its Products. Nonetheless, Defendants concealed and affirmatively misrepresented the true nature of the Products, as discussed herein.

57. Consumers lack the expertise to ascertain the true ingredients in the adhesive bandages prior to purchase.

58. Absent testing by a qualified lab, consumers such as Plaintiff and the Class Members were unable to determine that Defendants' Bandages contained PFAS chemicals given Defendants' failure to disclose the presence of PFAS.

59. Accordingly, reasonable consumers must, and do, rely on Defendants to accurately and honestly advertise their products' ingredients and benefits. Further, consumers rely on Defendants to not contradict those representations by using artificial chemicals in their adhesive bandages that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

60. Consumer reliance upon Defendants' representations and omissions were reasonable and foreseeable. It is beyond reasonable dispute that the presence of harmful chemicals in adhesive bandages, particularly Defendants' "quality you can trust" as advertised, is material to reasonable consumers.

61. Defendants had exclusive knowledge of the contents and ingredients of its Bandages, including whether the products contained PFAS chemicals.

62. Defendants also had exclusive knowledge of its ingredient suppliers and obtained or could have obtained information from their suppliers about the contents and ingredients to the Bandages, including whether they contained PFAS chemicals.

63. Likewise, Defendants are in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe.

64. Defendants' false statements, misleading, and material omissions are intentional and careless, and render their adhesive bandages worthless or less valuable.

65. Had Defendants disclosed to Plaintiff and Class Members that their Bandages contained and contain PFAS chemicals, Plaintiff and Class Members would not have purchased Defendants' Bandages, or they would have paid significantly less for them.

66. Plaintiff and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

67. Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, especially for a consumer health product such as a bandage.

68. In making the false, misleading, and deceptive representations, Defendants knew and intended consumers would pay a premium for their adhesive bandage products that are made from or contain synthetic or artificial chemical ingredients that are known to be harmful to humans and the environment.

69. This is evidenced by the Products packaging, which states "not made with natural rubber latex," clearly as an appeal to consumer preference on ingredients of their products.

70. A reasonable consumer would not expect dangerous and health-threatening chemicals to be in a bandage claimed to be made from fabric and intended to be used to protect cuts and scrapes.

71.  Plaintiff and Class Members paid money for Defendants' Bandages, and paid a premium for an expected quality. However, Plaintiff and Class Members did not obtain the full value of the Products due to Defendants' misrepresentations as described herein.

72. Plaintiff and Class Members purchased, purchased more of, or paid more for, Defendants' Bandages than they would have had they known the truth about the Products' harmful ingredients. Accordingly, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

## PLAINTIFF SPECIFIC ALLEGATIONS

73. Plaintiff Brenda Gudgel is a Florida resident who places a high priority on health and safety, and on the adverse health consequences of chemical exposure in products that she buys, including PFAS chemicals. In shopping for drug products for her and her family, Plaintiff was particularly concerned about cost-effectiveness and warning signs on labels. Based on the statements made by Defendants, their widely recognized name, and lack of information that the Products contained PFAS chemicals, Plaintiff believed the bandages were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

74. Plaintiff bought and used Target Up & Up Adhesive Bandages throughout the applicable time period for use in first aid applications at home. Plaintiff was unaware when she bought the bandages that the Product contained PFAS chemicals. Had Defendants been truthful and told Plaintiff she would be exposed to these chemicals, she would not have purchased Target Up & Up Adhesive Bandages.

75. Plaintiff suffered an ascertainable economic loss because of Defendant's statements and misrepresentations in that she bought the bandages that she would not have bought but for Defendant's statements and misrepresentations.

## CLASS ACTION ALLEGATIONS

76. **Class Definition:** Plaintiff brings this action on behalf of herself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

National Class: All persons in the United States who purchased the Products during the fullest period of law.

77. In the alternative, Plaintiff brings this action on behalf of the following State Sub-Class:

Florida Sub-Class: All persons in the State of Florida who purchased the Products during the fullest period of law.

78. Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

79. **Numerosity and Ascertainability:** Plaintiff does not know the exact number of members of the putative classes. Due to Plaintiff's initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout Florida and the United States. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendants' records, either manually or through computerized searches.

80. **Typicality and Adequacy:** Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff does not have any interests that are antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

81. **Commonality:** The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

a. whether Defendant committed the conduct alleged herein;

b. whether Defendants' conduct constitutes the violations of laws alleged herein;

c. whether Defendants' labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

d. whether the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") are adulterated and/or misbranded under Florida or federal law;

e. whether Defendants knew or should have known that the representations were false or misleading;

f. whether Defendants knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products");

g. whether Defendants' representations, concealments and non-disclosures concerning the TARGET CORPORATION Target Brand Up &

Up Flexible Fabric Bandages ("Bandages" or "Products") are likely to deceive the consumer;

h. whether Defendants' representations, concealments and non-disclosures concerning the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") violate FDUTPA and/or the common law;

i. whether Defendants should be permanently enjoined from making the claims at issue; and

j. whether Plaintiff and the Class are entitled to restitution and damages.

68. **Predominance and Superiority:** Common questions, some of which are set out above, predominate over any questions affecting only individual Class members. A class action is the superior method for the fair and just adjudication of this controversy. The expense and burden of individual suits makes it impossible and impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. given the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal

redress individually for the wrongs that Defendant committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

b. when Defendants' liability has been adjudicated, claims of all Class members can be determined by the Court;

c. this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

d. without a class action, many Class members would continue to suffer injury, and Defendants' violations of law will continue without redress while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct.

69. **Manageability:** The trial and litigation of Plaintiff's and the proposed Class claims are manageable. Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

<u>COUNT I</u>

**For Violations of Florida's Deceptive**
**and Unfair Trade Practices Act,**
**Fla. Stat. 501.201 et seq.**

70. Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 9-69 above as if fully set forth herein.

71. Plaintiff brings this claim on their own behalf and on behalf of each member of the Class.

72. Defendants violated and continue to violate Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of their business.

73. The material misstatements and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") were manufactured and sourced in the United States.

74. Plaintiff and Class members relied upon these advertisements in deciding to purchase the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products").

75. Plaintiff's reliance was reasonable because of Defendants' reputation as a reliable company.

76. Had Plaintiff known that the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") were not as advertised, they would not have purchased the product. As a result of Defendants' deceptive and unfair acts, Plaintiff and Class members have been damaged.

77. Defendants' conduct offends established public policy, and is immoral, unethical, oppressive, and unscrupulous to consumers.

78. Plaintiff and Class members are entitled to a refund or damages in an amount to be proven at trial.

79. Defendants should also be ordered to cease their deceptive advertising and should be made to engage in a corrective advertising campaign to inform consumers that its TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products") contain PFAS chemicals.

## COUNT II

### For False and Misleading Advertising,

### Fla. Stat. § 817.41

80. Plaintiff re-alleges and incorporates by reference the allegations of in the above-referenced paragraphs 9-69 of the Complaint as if fully set forth herein.

81. Plaintiff brings this claim on their own behalf and on behalf of each member of the Class.

On their website, in print advertisements, and in other forms of advertisements, Defendants made numerous misrepresentations of material fact regarding the composition of the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products").

82. Defendants knew that these statements were false.

83. Defendants intended for consumers to rely on its false statements for the purpose of selling the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages.

84. Plaintiff and Class members did, in fact, rely upon these statements. Reliance was reasonable and justified because of Defendants' reputation as a reliable company.

85. As a result of Defendants' misrepresentations, Plaintiff and Class members suffered damages in the amount paid for the TARGET CORPORATION Target Brand Up & Up Flexible Fabric Bandages ("Bandages" or "Products").

86. Plaintiff and Class members are entitled to damages and injunctive relief as set forth above.

## COUNT III

### Unjust Enrichment

87. Plaintiff re-alleges and incorporates by reference the allegations of in the above-referenced paragraphs 9-69 of the Complaint as if fully set forth herein.

88. Plaintiff brings this cause of action on behalf of himself and on behalf of the Class.

89. Plaintiff and Class members conferred a benefit on Defendants by purchasing the deceptively advertised Product at an inflated price.

90. Defendants received the monies paid by Plaintiff and Class members and thus knew of the benefit conferred upon them.

91. Defendants accepted and retained the benefit in the amount of the profits they earned from Defendants' Product sales paid by Plaintiff and Class members.

92. Defendants have profited from their unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiff and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

93. Plaintiff does not have an adequate remedy at law against Defendants.

94. Plaintiff and Class members are entitled to restitution of the amount paid for the Product and disgorgement of the profits Defendants derived from their deceptively advertised Product sales.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court:

a.      Certify this action as a class action;

b.      Award a full refund, compensatory, statutory damages as to all Counts where such relief is permitted by law;

c.      Enjoin Defendants' conduct and order Defendants to engage in a corrective advertising and labeling/disclosure campaign;

d.      Award equitable monetary relief, including a full refund or other restitution;

e.      Award pre-judgment and post-judgment interest at the legal rate;

f.      Award Plaintiff and Class members the costs of this action, including reasonable attorneys' fees, costs, and expenses; and

g.      Award such other and further legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


DATED:  May 6, 2024                           s/William C. Wright

                                              WILLIAM WRIGHT
                                              The Wright Law Office
                                              FL Bar No. 138861
                                              515 N. Flagler Drive
                                              Suite 350
                                              West Palm Beach, FL 33401
                                              Telephone: (561) 514-0904
                                              willwright@wrightlawoffice.com